06/21/21      USA v. BALLEW      19-10076-01      1

1              IN THE UNITED STATES DISTRICT COURT
                      DISTRICT OF KANSAS
2

3   THE UNITED STATES OF AMERICA,

4              Plaintiff,

5       vs.                          District Court
                                     Case Number
6   AUSTIN BALLEW,                   19-10076-1

7              Defendant.

8

9              TRANSCRIPT OF PROCEEDINGS

10
        On the 21st day of June, 2021 at 9:06 a.m. came on
11  to be heard in the SENTENCING HEARING in the
    above-entitled and numbered cause before the
12  HONORABLE JOHN W. BROOMES, Judge of the United States
    District Court for the District of Kansas, Sitting in
13  Wichita.
        Proceedings recorded by mechanical stenography.
14      Transcript produced by computer.

15

16  APPEARANCES

17      The Plaintiff appeared by and through:
        Mr. Jason Hart
18      United States Attorney's Office
        301 N. Main, Suite 1200
19      Wichita, Kansas 67202

20      The Defendant appeared in person, by and through:
        Ms. Jennifer Amyx
21      Federal Public Defender's Office
        301 N. Main, Suite 850
22      Wichita, KS 67202

23

24

25

06/21/21      USA v. BALLEW      19-10076-01      2

1            (The following proceedings were requested

2        transcribed:)

3            THE COURT:  We're here on Case Number 19-10076,

4   United States versus Austin Ballew.

5        May I have appearances, please.

6            MR. HART:  Good morning, Your Honor.  Government

7   appears by and through Jason Hart, Assistant United

8   States Attorney.

9            MS. AMYX:  Good morning, Your Honor.  Austin

10  Ballew appears in person and with counsel, Jennifer Amyx.

11           THE COURT:  Thank you.

12       Mr. Ballew, can understand everything that's being

13  said in the courtroom today?

14           THE DEFENDANT:  Yes, sir.

15           THE COURT:  This matter comes on for sentencing.

16       Anything we need to take up before we proceed to

17  sentencing?

18           MR. HART:  Not from the Government, Your Honor.

19           MS. AMYX:  No, Your Honor.

20           THE COURT:  Swear the defendant.

21       [Oath given.]

22           THE COURT:  Are you Austin Ballew?

23           THE DEFENDANT:  Yes, sir.

24           THE COURT:  How old are you?

25           THE DEFENDANT:  23.

06/21/21      USA v. BALLEW      19-10076-01      3

 1            THE COURT:  On December 17th, 2019 you pled

 2   guilty to five counts of sexual exploitation of a child,

 3   violation of 18 U.S. Code 2251(a); three counts of sex

 4   trafficking of a minor, violation of 18 U.S. Code 1591

 5   (a)(1).

 6            At the end of that hearing I directed preparation

 7   of a presentence report and I now have that report in

 8   front of me.  It's filed at Docket Entry 38 in this case.

 9   It includes an Addendum indicating no objections by

10   either party.

11            I also have letters in support of the defendant

12   from the Reverend Charles Greenwood, Francis Dawes, and

13   his mother.  I've reviewed all these materials.

14            Has everyone else had an opportunity to review

15   these materials and are there any corrections or

16   objections to the presentence report?

17            MR. HART:  Your Honor, the Government has had an

18   opportunity to review these materials.  We have no

19   further objections.

20            MS. AMYX:  That's correct, Your Honor.  The

21   defense also has no additional objections.

22            THE COURT:  Mr. Ballew, have you had an

23   opportunity to review the presentence report and go over

24   it with your counsel?

25            THE DEFENDANT:  Yes, sir.

06/21/21      USA v. BALLEW      19-10076-01      4

1          THE COURT:  Are you satisfied with her

2    representation in this matter?

3          THE DEFENDANT:  Yes, Your Honor.

4          THE COURT:  All right.  Since there's no

5    objections, make the following tentative findings:

6          Total Offense Level 43; Criminal History Category

7    I gives the following statutory constraints on

8    sentencing:

9          Custody on Counts 1, 3, 8, 11, and 13 not less

10   than 15 years nor more than 30 years on each count;

11   Counts 5, 7, and 15 not less than ten years nor more than

12   life on each count;

13         Supervised release on all counts not less than

14   five years up to life; not eligible for probation; fine

15   $250,000 per count; special assessment $100 per count;

16   JVTA assessment $5,000 per count.

17         Under the advisory sentencing guidelines it calls

18   for life imprisonment followed by supervised release of

19   not less than five years nor more than life; not eligible

20   for probation; fine of 50,000 to $250,000; special

21   assessment $100 per count; JVTA assessment $5,000 per

22   count.

23         Now I'll hear arguments on sentencing, beginning

24   with the Government.

25         MR. HART:  Thank you, Your Honor.

06/21/21      USA v. BALLEW      19-10076-01      5

1        Briefly, Your Honor, we're requesting the Court

2   impose a sentence of 25 years.  That's in accordance with

3   the 11(c)(1)(C) plea agreement.  It is at the top of the

4   range that is contained in that plea agreement.

5        The reason for this request, Your Honor, is that

6   25 years reflects the significance of the defendant's

7   conduct which involved a number of minor victims.  I

8   would note in this case that the defendant did not

9   actually have sexual contact in person with these minors

10  and in some instances was not able to actualize his

11  intended outcome, but in many instances he was able to

12  either obtain child pornography or images that presented

13  the children in provocative and, I guess lewd conduct

14  that they would not otherwise want shared.

15       In order to obtain this material the defendant

16  engaged in a full range of psychological pressures from

17  offers of romance, from simple peer pressure, to

18  threatening suicide, and then also offering money and

19  then even blackmailing once he had received what he

20  wanted.

21       The couple of saving graces for this defendant is

22  that his conduct was reported by one of the minors and,

23  thus, caused it to stop.  It was also a fairly short

24  period of time being in September of 2018 in which the

25  defendant was involved.

1          I would note, though, that for as much as it's a

2    short period, part of the reason why it's a short period

3    is because one of the minors reported him and even though

4    it was a short period, the defendant was aggressively

5    pursuing this type of conduct.

6          I would note that he, as part of his conduct,

7    disguised his identity, presenting himself as another

8    person.  And with all of these things in mind, Your

9    Honor, it's the Government's position that because the

10   defendant has accepted responsibility and avoided having

11   the number of minor victims come in and testify and

12   present these images and have to talk about them in front

13   of strangers, that the defendant deserves some benefit

14   for his acceptance of responsibility.

15         But that level of acceptance still warrants a

16   sentence of 25 years.  I would note that the guideline

17   calls for much more but we think the 25 years is

18   appropriate, followed by five years of supervised

19   release, and the $800 special assessment, one for each of

20   the counts.

21         I would note that because this conduct occurs

22   before the special assessment in 18 U.S.C. 2259(a), that

23   does not apply in this case.  And to my knowledge, we've

24   had no requests for restitution, though we've had contact

25   with the minor victims and their families.

1          That's the Government's position, Your Honor.

2 Thank you.

3          THE COURT:  Thank you.

4      Ms. Amyx.

5          MS. AMYX:  Your Honor, may I present from the

6 podium?

7          THE COURT:  Yes, please.

8          MS. AMYX:  May it please the Court.

9          Your Honor, Austin Ballew was 20 years old at the

10 time that these events took place.  He is a young man who

11 suffers from bipolar; has a mental disorder.  And we're

12 going to talk a little bit about his life and what lead

13 to these events but, also, the reason why 15 years of a

14 young man's life who has never served any term of

15 incarceration, why that would be sufficient but not

16 greater than necessary under the statute, as opposed to

17 the guidelines.

18          With regards to the guidelines, Your Honor, I

19 think the law just, frankly, has not been able to catch

20 up with the variety, um, of offenses that are sort of

21 covered by the sexual offense umbrella and so there's

22 great disparity between individual offenders, their

23 conduct, and what their ultimate sentence is and I'd also

24 like to present some of that information to the Court as

25 we proceed.

06/21/21      USA v. BALLEW      19-10076-01      8

1        Beginning with the first sentencing factor under

2   the statute, and that's the nature and circumstances of

3   the offense, I would like to begin by saying that Austin

4   from the very beginning, from -- from when he was charged

5   and went into custody, immediately initiated negotiations

6   to try to find a way to accept responsibility for what he

7   had done.

8        Specifically, the offense in this case involves a

9   total of 25 images and three videos.  This Court has

10  certainly been around long enough to know that that is on

11  the lesser end of materials in cases like this.  That,

12  again, in no way tries to -- to indicate that this

13  behavior was appropriate, it's just that kind of with the

14  balancing the proportionality of what the Court routinely

15  sees, it is limited to 24, I believe, images, and three

16  videos.

17       Another key fact and factor here, Your Honor, is

18  that there was absolutely no additional distribution of

19  these materials.  This was a -- a short period of time in

20  September of '18 -- 2018 when this took place during a

21  manic bipolar episode and, yet, even then he did not take

22  the materials and redistribute them.  The way the

23  Government found the materials is by locating them on the

24  Facebook page which he had already shut down prior to

25  their contacting him or the investigation.

1           As well, Your Honor, to there not being any

2   further distribution or attempts to use these materials

3   in any way, I think that that is significant because from

4   the victims' standpoint they have -- they never have to

5   live with the fear or uncertainty that materials provided

6   to Austin will exist or continue to exist on the internet

7   because he did not distribute them.

8           The Government did not locate the devices that the

9   images were created from or on or used.  The way that the

10  investigation developed was just to go back to this

11  closed Facebook page and find the images through that

12  Facebook Messenger program.

13          The event, in essence, ended when his bipolar

14  episode ended, sort of the fog lifted, the hypersexuality

15  lifted, and at that point he shut down what he was doing.

16  It didn't change the fact that he is still a young -- a

17  lonely young man who has had a difficult childhood, and

18  we'll talk a little bit more about that as well.

19          The Government touched on the victims not having

20  to testify in this case but I think that, frankly, that

21  the significance of that cannot be overstated in this

22  particular case.  And that's because there were a number

23  of issues in the case that could have made it a triable

24  case, Your Honor.

25          The reason I say that is because some of the

1   specific requirements of the individual elements of the

2   offenses.  Specifically, when Austin made these demands

3   for nude materials, one of the questions is were

4   they -- the materials produced in response to those

5   demands or had they previously been produced?

6        That was going to be a very difficult question for

7   some of those individuals to answer, especially if there

8   was other conduct that predated Mr. Ballew's conduct

9   where those images may have been utilized.

10       Moreover, even when the total images of 24 images

11  and then three videos, a number of the images would not

12  have met the *Dost* factors.  Specifically, under federal

13  laws, certain images are not considered sexually explicit

14  material.

15       For example, the female breasts are not considered

16  sexually explicit material on their own.  And so some of

17  the images did have breast present but would not have

18  qualified.

19       Again, that's not suggesting that the underlying

20  demands for the nude material was proper in some way but

21  it makes a difference what was produced and the degree of

22  what was produced.

23       Another key factor, Your Honor, that I think can't

24  be ignored in this case is that Austin's conduct, he cast

25  a very broad net when he created this false Facebook page

1  or fake page, using an identity that he had made up,

2  grabbed pictures from the internet.

3       It gave him the opportunity to be someone else.

4  And when you've had the life that Austin has, that makes

5  sense to me that he didn't like being himself.  He didn't

6  feel cherished; very lonely; struggled with interpersonal

7  relationship; bullied most of his life.  And so online he

8  could be someone else; he could create someone that he

9  thought was powerful and that people wouldn't push

10  around.

11       But as he did this you should know that he

12  contacted, um, indiscriminately, females.  Females from

13  the age of 14 to 40.  So this was not a situation where

14  he was specifically targeting those who were under the

15  age of 18 or under the age of 16.  You know, bear in mind

16  he was 20 years old at the time of this offense.  At the

17  age of 20 our brains have not even, frankly, fully

18  cognitively developed.

19       I think that there is a different atmosphere or

20  circumstance when we have somebody in their 40s who is

21  specifically targeting those under the age of 18 and that

22  is their -- their preference or their focus.  It's

23  not -- not the case here.  Austin was literally just

24  looking for sexual material and I think some of that

25  comes out through the -- the presentence report.

06/21/21      USA v. BALLEW      19-10076-01      12

1          In addition to his young age and lack of -- of

2    prior criminal history, I'd also talk a little bit about

3    Austin's childhood.  From a young age he was never going

4    to get the same kind of attention as his brother because

5    their needs were very, very different.  As Austin grew

6    older I think he got more and more isolated because he

7    got made fun of at school and bullied and so he shut down

8    more and more and more and that made it easier, I think,

9    to turn to the internet to try to find some kind of

10   companionship.

11         When the Government talks about there never having

12   been any sexual -- no touching offenses, that Austin

13   never had sex with an underaged minor and, in fact, never

14   even came close to having sex with an underage minor.

15   And I would like to talk a little bit more about that

16   further on in some of the other characteristics or

17   factors from the sentencing statute.

18         Regarding the characteristics of Austin

19   specifically, bipolar is a mental illness that has a very

20   difficult learning curve.  What I mean by that, Your

21   Honor, is I think depression is well understood.  We

22   understand it's exhausting, that it can be difficult for

23   people to even function and that is clearly visible.

24         Bipolar is a difficult mental illness because I

25   think the vast majority of the time you may feel fine but

1  if you go through a depressive cycle or manic cycle,

2  frankly, it can devastate your life and it certainly, it

3  is not uncommon for people who are going through this

4  bipolar learning curve to have interaction with the

5  criminal justice system.

6         Specifically, in Austin's case, he, I think

7  watched his mom struggle for years and, again, it

8  was -- it was something where it's not like anybody

9  chooses to be bipolar, it's something that gets sort of

10 thrust upon you and you have to deal with it as an

11 adversity.  But for Austin, I think it was one more

12 reason he rejected himself.  He didn't like himself and

13 he was, I think driven to try to be somebody else.

14 Online.

15        I think his mom can probably do the best job

16 explaining how difficult bipolar can be, especially when

17 you're managing a cycle and the hypersexuality that comes

18 with that condition.

19        I think that the PSR does do a good job of

20 explaining the problems that he had in childhood.  I

21 think despite his mom's best efforts, when you are

22 raising someone without a father who needs kind of more

23 direction and more confidence to be able to build their

24 own identity, that was something that -- that Austin

25 never had.  But as he is now entering his adult years, I

1 think it's something that, again, he recognizes and as he

2 cognitively develops I have every faith that Austin will

3 make it past this portion of his life and that it will

4 not define him for the rest of his life.

5       When we talk about the need for the sentence

6 imposed to reflect the primary purposes of sentencing,

7 the first is certainly retribution.  Your Honor, the

8 defense is requesting a 15-year sentence with 10 years of

9 supervised release.  That's a total of 25 years of his

10 life.

11       THE COURT:  It says five years supervised

12 release in my documents.

13       Is it five or ten.

14       MS. AMYX:  I think the Government is

15 recommending five and we are asking, because we are

16 asking for the mandatory minimum 15 years, for the Court

17 to consider imposing a longer term of supervised release.

18       THE COURT:  Okay.

19       MS. AMYX:  At -- again, at the age of 20 when he

20 committed the offense, at the age of 23 now, we are

21 literally talking about 15 years in prison followed by

22 another ten years of supervised release.  That means well

23 into his adult life he will be managed by this Court.

24       But more than that, Your Honor, the 15 years that

25 Austin will be serving is the -- what many people sort of

1 reflect back on as the best years of their life, their

2 20s.  It's where they find themselves, it's where they

3 grow, it's where they build for the coming years.  And

4 Austin, um, based on his conduct and his agreement to go

5 serve this term will go and he will be incarcerated for

6 the best years of what many people consider to be their

7 lives.  So, again, I think that that is significant

8 retribution.

9        And, again, we talk about deterrence.  Knowing

10 what he knows now I have no doubt Austin would ever, ever

11 commit an offense like this again but, again, a 15-year

12 sentence would be significant specific deterrence but

13 also because it is a mandatory minimum, I think it also

14 reflects a general deterrence for society for a young man

15 of his age to face this amount of sentence.

16        There are some things that the system doesn't

17 build forgiveness in for and this is one of them, but we

18 should fix that on this end and not in additional time.

19        Moreover, I think our ultimate request is for the

20 Court to recommend to the Bureau of Prisons that Austin

21 serve his sentence in Seagoville.  One of the goals of

22 sentence is, again, rehabilitation and Seagoville

23 specifically has some great programming that Austin can

24 take advantage of for that purpose for his therapy as

25 well as vo -- the vocational programming that they have.

1          His mom also has, um, a job opportunity in

2   Seagoville so if he is placed there, his family can move

3   and he will have support and, in essence, they will build

4   a new life there in another place.

5          As we then turn to sort of the next sentencing

6   factor we talk about the kind of sentencing available and

7   I want to talk for just a second about mandatory minimums

8   and the two that are applicable in this case.

9          The exploitation of a minor, which has the 10-year

10  mandatory minimum; and the sex traffic offense, which has

11  the much higher 15-year mandatory minimum.

12          THE COURT:  I think those are backwards, right?

13          MS. AMYX:  And I may have those backwards, I

14  apologize, Your Honor.

15          What I want to draw the Court's attention to is

16  the specific conduct that kind of comes behind those two

17  charges.

18          I think everything about Austin's conduct would

19  have been covered by exploitation offenses.

20  Specifically, and the reason why I say that, is

21  his -- his goal, his intent was to get pornographic

22  imagery of any age but including those under the age of

23  18.  He was not trying to have sex with -- with any of

24  these girls.

25          I -- the -- the conversations about sex were to

1  further the goal of attempting to get the materials and

2  how to --

3          THE COURT:  Here's what I don't understand.

4          MS. AMYX  Go ahead.

5          THE COURT:  If all he wanted was images, most of

6  this stuff is available legally, right?  Except for

7  the -- the -- I know there was some 14 year olds, one or

8  two were 17 years old in here but, I mean, but what you

9  told me, I guess my point is, but not the ones with whom

10  he is charged, could be obtained legally.  But what you

11  have told me is he was targeting women from the age of 14

12  up to 40 and it was just more happenstance that a subset

13  of them were underage.

14          But if that were entirely the case, then he could

15  have -- seems to me he could -- the internet is brimming

16  with adult pornography.  He could have gotten that for

17  free.  Wouldn't even had to pay for it.

18          So, there's something different going on here that

19  I'm still looking to put my finger on.  But if that's

20  what we are dealing with here, I'm having a little hard

21  time buying the -- the idea that it's just wanting images

22  when if the age was irrelevant, that stuff was available

23  lawfully in numerous formats all over the internet, book

24  stores, gas stations, whatever.

25          MS. AMYX:  And in Austin's history, he talks

1  about initiating the use of pornography when he's 16, 17

2  years old.

3        And I don't want to suggest that age is

4  irrelevant, Your Honor.  I think that part of this was

5  being someone else.  And initially when you -- you create

6  the page and then what eventually happens with the page,

7  I don't know that you've planned out specifically what

8  you're going to do with it, but he creates the page,

9  starts having conversations, likes being someone else

10 online where he gets to be tough, you know, he said some

11 terrible things, unquestionably, and, um, again, was very

12 aggressive in the manner in which he went about trying to

13 get the materials.  And I don't think it's just about the

14 pornography, I think it's about the identity and the

15 rejection of himself, the desire to be something else.

16 And online he got to be that.

17        The distinction I want to make is that he was

18 never going to go meet any of these individuals in

19 person.  First of all, he couldn't; he's a scrawny white

20 guy.  If you show up, after having portrayed yourself as,

21 you know, a very handsome, young, black man who's very

22 confident, he's not going to show up as the scrawny white

23 guy to try to engage in actual sexual act.

24        This is the reason why the defense filed the

25 motion to dismiss the human trafficking counts because in

1  all of our research, Your Honor, and we supplied every

2  case that we could find that had facts, in no instance

3  was there anything remotely like this charged as sex

4  trafficking.  In those instances there were girls who

5  actually were made to either engage in sex, or by force

6  or by threats, or even prostitution, underage girls who

7  even willingly engaged in prostitution, it's still sex

8  trafficking.

9        Our point with the filing of the motions is that

10 there should be a difference between actus reus and the

11 mens rea.  The -- and specifically that there was no

12 overt act which would have furthered the actus reus.

13 There's no, um, sending of money; there's no purchase of

14 condoms; there's no meet up place; he doesn't leave the

15 house and start driving in a direction.

16       Even on the least liable sex trafficking cases

17 where there's no minor victim and it is a law enforcement

18 officer who's trying to set it up, they still have to

19 have someone on the way to the meet or, um, again, having

20 purchased condoms or grabbed the money from the bank to

21 make the payment, something specific to further that

22 specific sex trafficking act.  That just wasn't present

23 here.

24       And, again, that is another reason we could have

25 gone to trial on those counts.  But Austin from the very

1  beginning didn't want to do anything to make it worse or

2  harder on the girls that he had contacted, and always

3  from the beginning wanted to avoid a trial; didn't want

4  to put himself, his family, or the victims through it.

5  His head has always been, I did something wrong and I

6  need to pay for it.  The question is how much of his life

7  is enough for him to pay for.

8       And the Court was correct to point out the number

9  and age of the victims.  We're talking about, um, three

10  14 year olds, three 16 year olds, and two 17 year olds.

11  And, again, nothing about that -- that -- everything

12  about that age range is certainly underage but this Court

13  also routinely sentences people who have materials from

14  kids who aren't even at a point where they can talk or

15  even convey to an adult what is happening to them.

16  There's just really no choice at a certain age in

17  childhood and, again, as the Court determines

18  proportionality and sort of this wide range of conduct

19  underneath this -- these types of offenses, this Court

20  has certainly seen people who are selecting children much

21  younger who have no autonomy whatsoever.

22       I think that it matters that individuals in this

23  case did have a choice.  Again, I don't want anything I

24  say to come across as victim blaming or trying to suggest

25  that these girls did anything to hurt themselves.  But I

1 think it is different when you have someone who can tell

2 an adult.  And that is ultimately what did happen in this

3 case.

4       And, specifically, with regards to the images of

5 the 14 year olds one 14 there was no images; one 14 year

6 old there was two images; and the third 14 year old there

7 was no images.

8       The videos, um, two of the videos were for one of

9 the 17 year olds that also had 11 of the images; and one

10 of the videos was from the 16 year old with four of the

11 images, so there was a total of three of the eight who

12 there was just no images that have been produced at all.

13       Again, in no way does this I think minimize the

14 crime but I do think it is mitigating as to the sentence.

15       Turning next then to, Your Honor, sort of the

16 guidelines themselves, when the guidelines are broken

17 you -- you start at the wrong place and you end at the

18 wrong place.  The idea that Austin could be facing a life

19 sentence having never served a day in prison and given

20 the type of ranges that -- that routinely get handed out

21 for people who possess much more child pornography, or

22 are actually engaged in touching offenses, again, 15

23 years, the mandatory minimum is significant and it is

24 sufficient in order to -- to punish him for the crime

25 without taking away his entire life.

06/21/21     USA v. BALLEW     19-10076-01     22

1        Moreover, I want to talk just a second about

2   proportionality and what happens because so much of the

3   charging decisions are out of the control of the courts,

4   obviously.  That is a responsibility of the Government to

5   charge people.  But what you get charged with then

6   dictates your mandatory minimums and, ultimately,

7   potentially, your sentence.

8        The case that I could find that was closest to

9   Austin's case in the country was the case of the young

10  man by the name of Austin Jones.  Austin Jones was

11  a -- considered a YouTube star, someone who was very

12  popular as a young man with teenage girls.  He used

13  his -- his fandom with 14 year old girls to request nude

14  imagery of those girls and a number of them produced a

15  significant quantity.

16       He had substantially more victims; substantially

17  more material was produced.  He specifically told them,

18  You have to prove -- you have to prove you're my biggest

19  fan by providing me with these materials.

20       Mr. Jones, despite having a much more significant

21  case, victim history, and pornography produced was

22  charged with child pornography and ultimately only

23  sentenced to ten years.  That's significant, Your Honor,

24  because I think it is that Mr. Ballew's conduct in his

25  case is similar, although, um, on a direct comparison,

1  even less damage, I suppose was created by his conduct,

2  but much like Mr. Jones used his fame and persona online

3  to blackmail these girls to get imagery and Austin used a

4  fake persona online to do the same, somehow Mr. Jones

5  only winds up with ten years and yet Austin is looking

6  at, you know, this range of 15 to 25.

7          THE COURT:  Well, let's pause there for a

8  minute.  Because one of the things that's been on my mind

9  is that, um, this case isn't charged as a possession or

10  distribution of child pornography case.  It's charged

11  differently.

12         And so in my mind I'm looking at it, I'm hearing

13  you talking about the number of images and videos but the

14  thing that troubles me -- a few things that trouble me

15  about this case, and in my mind tend to set it apart from

16  the possession cases and the cases where people are, you

17  know, collecting this stuff over the internet and trading

18  them, is that this defendant was the one instigating the

19  creation of these images, so he has direct, although not

20  physical contact, but direct communication contact with

21  the victims and in his various ways enticing them to do

22  it.

23         And then what I see several times in the

24  presentence report is once they are stupid enough to send

25  something to him, then he springs the trap.  Now it's, I

1  own you.  You are now going to do what I tell you to do.

2  Or I'm going to plaster this stuff on the internet and

3  basically shame you.  So to me that's different.  That

4  strikes me as more predatory and troubling.

5      So for the general proposition and then

6  specifically with respect to this *Jones* case you were

7  just referring to, you said Jones blackmailed people.

8  And that's what I see here, at least in some of these

9  victims, is this extortion or blackmail type behavior

10 once he has the initial images.

11     Clarify that comparison with the case you're

12 referring to and then if you want to address that more

13 broadly, then feel free.

14     MS. AMYX:  Thank you, Your Honor.

15     I would like to address both aspects of what the

16 Court talked about.

17     Regarding the blackmail, specifically, we think

18 that's why, ultimately, that's why in negotiations we

19 agreed to the 15-year mandatory minimum as opposed to

20 continuing to strive for the ten or taking the case to

21 trial.  I think Austin has accepted not only the -- that

22 the initial request to the underage girls was improper

23 but his conduct about pursuing them is what really kind

24 of, again, took this to another level.  And Austin does

25 accept that.

1          What I want to be clear about, Judge, is while

2  it's clear that the items were provided to Austin, the

3  images were provided, the -- the open issue is whether

4  they were produced in response, or they preexisted or

5  were made for some other purpose.

6          And I think that is a significant difference

7  because if -- if the individuals in this case were

8  speaking to someone else online, had previously provided

9  images to someone else, or created those images on a

10 different date and were simply using them to supply the

11 request and on opportunity to get more, but I don't think

12 he was -- I don't think that there was -- the evidence

13 that he was initiating the creation or that the materials

14 were specifically created for this purpose, I don't think

15 there is strong evidence of that.  I think that would

16 have been a trial issue.

17          THE COURT:  Well, let me understand -- let me

18 understand how that plays in this case.

19          If you're questioning whether the material was

20 produced based on his requests or demands, does that

21 affect the question of guilt?

22          Because I don't want -- I don't think it is proper

23 to have him plead guilty to offenses and then come in and

24 question that he -- the underlying factual basis.

25          Now I can break out the statute here and read

1  through it in more detail but I want to know from both of

2  you right now whether drawing into question the

3  production of these images was in response to his

4  activity, does that affect the underlying question of

5  guilt?

6          MS. AMYX:  From the defense perspective it does

7  not.  We accepted responsibility and agreed to plead to

8  the charges.

9       However, with regards to that evidence

10 specifically, I think that as opposed to the discovery

11 illustrating very clearly one way or the other, the only

12 way for that sort of to be fully tested would have been

13 to go to trial over it.  Because it would have

14 just -- again, because the devices themselves weren't

15 collected we don't have the electronic metadata that

16 would tell us potentially when the images or videos

17 actually were created or on date.

18      And, instead, we have the materials that were

19 collected from the Facebook account.  So it would have

20 been subject to each individual, um, that actually

21 produced something, I think, so it would have been five

22 of the eight, whether or not those images were produced

23 pre or post the communications with Mr. Ballew.

24          THE COURT:  And so is it your position that

25 because you don't have that information you can't tell

1  for sure when the images were created but the

2  client -- your client, the defendant, acknowledges that

3  he did ask for them and so to resolve uncertainty around

4  trial and dismissed other charges, he was willing to

5  accept that he asked them to do it and therefore the

6  evidence would support the --

7          MS. AMYX:  That's correct.  In the interviews of

8  the minors, that question wasn't specifically asked in

9  that way.  The specific image that you produced, you

10  know, when was it produced, was it after?  So, again,

11  Austin is here today to take full responsibility for what

12  he did, and I -- again, the acceptance of responsibility

13  in this case I think is extraordinary.

14          He specifically said -- pled for a charge for each

15  offense, regardless of whether images were created or

16  not.  He pled to -- I think I said that wrong.

17          He pled to an offense for each victim.  That is

18  what the Government wanted and despite that, the victims

19  were not of one mind in this case.  As the Government

20  announced and explained at the plea agreement, they did

21  not speak with one mind.  They had some different

22  feelings about degrees of participation or having to go

23  to trial, sentencing ranges, things like that.  So,

24  ultimately, this is why the 11(c)(1)(C) has been

25  negotiated and presented to the Court.  But the fact that

1  Austin did not make any of the victims come to court and

2  talk about when they produced the materials that were

3  provided I think is significant.

4      Again, nothing I say is meant to challenge his

5  plea but this Court can take into account the weight of

6  the evidence, the sort of overwhelmingness of the

7  evidence in this case versus things that would have been

8  legal issues at trial.

9      THE COURT:  Okay.  Mr. Hart, anything about that

10  whole line of explanation, reasoning, and argument

11  concern the Government with respect to the propriety of

12  the underlying plea?

13      MR. HART:  Your Honor, the statute at 18 U.S.C.

14  2251 criminalizes using, persuading, inducing, and a

15  couple of additional verbs.  It's the act, not the actual

16  picture, that is the substance of that crime.  It is

17  frequently an excellent evidentiary component if I have a

18  picture that was produced but it's actually the request,

19  the demand, the inducement, the persuasion, the -- I'm

20  trying to remember the other verbs -- but coercion that

21  precedes the production that actually rings the bell for

22  the -- that particular statute.

23      We frequently get ourselves wrapped around the

24  axle thinking, well, there must be a picture produced in

25  order for that crime to occur.  That is simply incorrect.

1  A picture being produced makes it much easier to prove

2  but in this case, we had recordings of the communications

3  via Facebook which made the requests and the demands, the

4  inducement, the coercion, the persuasion much clearer.

5      So I agree with Ms. Amyx in the sense that the

6  statute for 2251 does not require the production, it

7  doesn't require a picture actually be made.  It simply

8  that that's the purpose of -- that's the purpose of the

9  persuasion, inducement, the coercion.  The communication

10 is essentially directing that to happen.  So in this

11 case, though, you actually do have some images that are

12 produced and submitted in a sense, which provides even

13 stronger evidence of what the defendant was trying to do.

14     So unless the Court has additional questions, I

15 think I've answered it.

16         THE COURT:  Okay.  Thank you.

17     Ms. Amyx, please, go ahead.

18         MS. AMYX:  Thank you, Your Honor.

19     We've talked, I think, about the disparity and

20 sort of the wide range of charges that can be produced in

21 a case like this but as far as the conduct itself, we

22 have a 20-year-old man with bipolar who is going through

23 a manic episode in September of 2018.  And the result of

24 that, again, is the specific number of images that we

25 have talked about and the videos that we have talked

1  about that were never distributed to anyone else.

2      Unquestionably, I think the victims in the case,

3  and certainly Mr. Ballew, have learned a valuable lesson

4  and I hope some day the law catches up and we do a better

5  job of distinguishing between different types of

6  offenders and offenses.  But in this particular case,

7  Your Honor, Austin's asking the Court to sentence him to

8  15 years in prison, with -- with eight victims.  He is

9  literally serving over a year per victim, whether

10  anything was produced or not, just for having put them in

11  that position.

12      If -- if he is sentenced to more time than that,

13  I'm not sure what the additional time would be for.  I

14  mean, it would literally be warehousing him at that

15  point.

16      Moreover, if the court does give us the 15-year

17  mandatory minimum, we've asked for the ten years of

18  supervised release for a reason.  Because at that point

19  Austin's coming out of prison he will not have really

20  lived as an adult independently.  Certainly not with a

21  fully, cognitively developed brain.  So the ten years not

22  only gives him more time to transition, and I think

23  protect society because he can be so closely monitored on

24  supervised release for a longer period of time, but going

25  into his sentence, he literally has basically the next

1  20, 25 years of his life set out for him.  That is a plan

2  and a goal that he can follow while he is in prison and

3  then even when he gets out.

4      And if he gets out and he makes it, Your Honor,

5  you'll have no regrets.  If, God forbid, he gets out and

6  he doesn't, the Court still has the opportunity to send

7  him back to prison for huge chunks of his life.  But as

8  young as he was, as close in his age as the victims were,

9  I think that this case does get set apart.

10      Moreover, as an adult he'll have a chance to have

11  real mental health treatment, a real medication and

12  therapy dynamic which, again, we don't even have a fully

13  formed, cognitively functioning brain at that age but as

14  he goes through the next 15 years in prison, he has the

15  opportunity to center himself, to reconnect, to build an

16  actual identity of who he wants to be.  And it's

17  certainly not the guy who is in court for these kind of

18  offenses at 23 that he committed at 20.

19      Your Honor, I am happy to answer any of the

20  questions, but I would like for an opportunity to hear

21  from Austin's mom and Austin, specifically.

22          THE COURT:  Keep -- you refer to -- several

23  times to the coincidence of a manic episode while this

24  was going and I -- I've read through the presentence

25  report, there's some discussions in there about mental

1  health issues, but can you -- can you point to paragraphs

2  in the presentence report that help show me the

3  coincidence and timing between the offense conduct and

4  mental health episode that you're referring to?

5       Was there treatment?  Evaluation?  Anything else

6  documented in here that gets into that time frame?

7       MS. AMYX:  Your Honor, I'm not sure that it

8  specifically is going to fit into that timeline but I

9  think that there are some paragraphs that sort of lay out

10 how we get here.

11      Specifically, from the age of really 11, 12 years

12 old he starts battling mental health disorder.  And that

13 is a very young age.  We sort of indicate the

14 significance of it and may also indicate sort of the lack

15 of maturity as he goes through these formative teenage

16 years.  Starts then on medications and is very difficult.

17      When you start mental health medications,

18 especially things like Seroquel, unless they get the

19 combination right, which may take up to two years, you're

20 going to feel like a zombie sometimes; you're going to

21 have bursts of energy; you're going to have weird

22 explosive anger.  And I think he experienced all those

23 things as he worked through -- our way through perhaps

24 137 to 142 but, specifically, starting about 140 it

25 starts talking about in 2018 when he is really

1  struggling.

2       And, specifically, in March of 2018 as he goes

3  through the first manic episode it is, for whatever

4  reason, it's relatively common when bipolar for people to

5  go through their cycles in the fall and in the spring and

6  that seems consistent with his history.  We have March

7  and September.

8       So he has been provided the prescribed variety of

9  pills over the years.  Some certainly work better than

10 others but I think part of maturing and being an adult

11 mental illness is you have to accept -- even if you feel

12 okay on that particular day, you have to take your meds

13 year around for that one, six-week, or eight-week period

14 when you're going to go through a depressive or through a

15 manic cycle.

16      Again, in March of 2018 he is admitted for being a

17 danger to himself.  Judge, at this point, I mean, Austin

18 had already had one suicide attempt.  When I talk about

19 his rejection of self, that is very real.  And as a young

20 man, to love yourself so little -- and I don't think he

21 would do it today because of the pain it would cause his

22 mom, that's something -- they're very close and he's

23 learned from it.  And the reason I come to that

24 conclusion, Your Honor, is that in the over two years

25 that Austin has been in the Butler County Jail, four

1  different inmates have committed suicide.  One just in

2  the last week or so.  And Austin has seen all of that,

3  experienced it, and yet he is bound and determined to

4  prove that he is not this man and won't be this man for

5  the rest of his life.

6       I think he wants to prove it to himself, I think

7  he wants to prove it to his mom.  But certainly to the

8  courts and to his victims that, you know, this is out of

9  character for him and not something that he would do

10  again.

11       I hope that answers the Court's questions about

12  sort of the specific mental health timeline.

13            THE COURT:  Okay.

14            MS. AMYX:  I think the rest of page 26 and 27

15  talk about going through kind of the March disorder and

16  then he falls off again in the spring and his case ends

17  up being closed in October for that particular session.

18       And I think, again, his mom can probably speak to

19  a little bit about when she recognizes the changes, when

20  he is cycling, and maybe give the Court some insight into

21  that.

22       But addressing Austin's mental health, again, it

23  protects him, it protects the community, prevents

24  recidivism, um, and while punishing him, also gives him

25  an opportunity to recover, to figure out how to live as

1   an adult man with bipolar.

2          THE COURT:  Okay.

3          MS. AMYX:  Thank you, Your Honor.

4          THE COURT:  Thank you.  I'll hear from his

5   mother.

6       You his mother?

7          MS. BALLEW:  Yes, sir.

8          THE COURT:  You want to speak for him?

9          MS. BALLEW:  Yes, sir.

10         THE COURT:  Come on up.

11         MS. BALLEW:  Good morning, Your Honor.

12         THE COURT:  Good morning.

13         MS. BALLEW:  Ginger Ballew, I'm Austin's mom.

14      Do you have kids?  You ever wanted to hug one and

15  punch them in the throat at the same time?  Because I

16  would love to hug my child but I'd like to give him a

17  good, firm thumping for his life decisions.  Because

18  regardless of the sentence you give him, he has, for a

19  lack of a better term, he has screwed the pooch.  And in

20  a massive way.  Because regardless of how much time you

21  make my child serve, be it 15 years or 25, he will carry

22  this with him the rest of his life for the decision he

23  has made.

24      He does have a lot of mental issues.  I have had

25  him in and out of three different institutions because he

1  tried to kill his self.  He tried slitting his wrists, he

2  tried hanging his self, and he tried OD'ing on pills a

3  couple different times.

4         He is an amazing child, I guess he's a young man

5  now, but he really does have a heart of gold.  He would

6  give you the shirt off his back if you were walking down

7  the street and needed one.

8         Over the course of this lovely adventure we've

9  obviously found out some things about my child that I

10 didn't know that I do think brought him to some of his

11 bad decisions.  Some of it is my fault, because I failed

12 as a parent, because I missed some things.  But that's on

13 me; that's not on him.  It is hard to raise boys.  It is

14 even harder to raise them with very little support.

15        He does fully, fully, fully acknowledge that he

16 screwed up.  We talk every other day because I am the

17 type of mother that even if he don't live in my house I

18 talk to my children every day because my children are my

19 life.  They are what I live and breathe for.  So we talk

20 every other day.  That's not cheap on the pocketbook but

21 that's okay because he is my son and I have his back

22 regardless of how bad he screwed up.  Because it was a

23 bad decision, it is not a lifestyle.  And that's what he

24 tells me.

25        He goes, Mom, I made a bad choice, I messed up.  I

1  have got to do my time, I have to fix this, so I can get

2  out and make a better life.  And I truly, truly believe

3  he means that from the bottom of his heart.

4        Because he tells me, Mom, you're the only reason

5  that I -- I'm here.  You're the only thing that keeps me

6  here.  I am sorry I let you down, I'm sorry I broke your

7  heart.  I'm sorry.

8        He didn't break my heart.  He's not a

9  disappointment.  His bad decision is a disappointment

10 because I thought I had brought him up better than that.

11 But like I said, it's hard raising two kids.  I have one

12 that is very special needs and I spent a lot of time up

13 in Kansas City in the hospital with my other son, so he

14 had to go to babysitters for a week at a time here and

15 there while I was with my other son.  Like I said, I

16 failed him; he didn't fail me.

17       But he is a good kid.  There is good in him.  And

18 I really do believe he is learning his lesson and when he

19 does get out, he will not stick his head where it don't

20 belong again.  Because if he does, I will manually remove

21 it for him and he will not have a chance to come back to

22 a courtroom.  Because he will pay for his bad decisions.

23 He's going to pay for his bad decisions.

24       And I do believe that even though they were

25 horrible bad decisions, I do believe they will make him a

1  better man in the long run.  I believe it will break a

2  cycle that I was unaware of.  And will probably keep

3  other things from happening to other people.

4      He lost his grandma while he was in here to

5  cancer.  He didn't get to see her or say goodbye.  My dad

6  will be dead before he's out.  He has a brand new niece

7  that will be almost a grown woman before he gets to come

8  home and meet her for the first time.  He's missing a lot

9  of life.  A lot of life.  And it is so painful not having

10 him with us.  Not having him at home with me.

11      But I understand he messed up and he has to pay

12 his dues because when we screw up, we step up and we fix

13 it.  Even if it sucks.  And it's hard.  Because if you

14 screw up, you got to grab your boot straps and you got to

15 make it right, regardless.

16      Do I think he needs to go away for 25 years?  No,

17 that's the mom in me.  I would like to have him home two

18 years ago.  But he screwed up and I know he's going to

19 have to go away for a little while, I just tell myself,

20 Let's just get there, get it done and get it over with so

21 we can get him home and go on with our lives.

22      I do have a job opportunity down in Texas.  And if

23 that's not where he goes, that's my kid, I'll relocate.

24 Ain't nothing to walk away from everything I own for my

25 child.

06/21/21      USA v. BALLEW      19-10076-01      39

1          I do appreciate your time, Your Honor.

2          THE COURT:  Thank you.

3          THE DEFENDANT:  Thank you for your time, Your

4    Honor.

5          To begin with I would like to apologize for the

6    actions that have brought me here before you today.  For

7    that I am deeply sorry.  It was immature and childish.

8    And there's nothing I can do to take that back.  So I am

9    taking responsibility for my actions.

10          I would appreciate leniency but I do not demand

11   it.  That is your choice.  I intend to use this time to

12   make the best of it and learn something and become a man

13   that not only can my mother be proud of but there is a

14   use to society.  And I hope and pray that I am never in

15   this position again.  I truly regret what I have done.

16   And I am sorry that I have taken up your valuable time.

17          That will be all, Your Honor.

18          THE COURT:  Thank you.  Let me take a few

19   minutes here and a moment to go back and read over a

20   couple things and make my final decision but I want to

21   talk to you before I go just to make sure you understand

22   some things.

23          You just came here and told me that the things you

24   did represent childish and immature decisions.  It's more

25   than that.  It's a couple of perspectives I want you to

1  have.  One of them is, and I don't know if anybody has

2  ever told you this or had these kind of conversations

3  with you but after today, you won't be able to say that.

4       An honorable man treats women with respect and

5  kindness.  You try to help them and not hurt them.  You

6  don't try to take advantage of them.  If they're in a

7  difficult situation you try to help them.  If they need

8  protecting, an honorable man protects a woman.

9       But the activities that you have undertaken here

10  are to prey on girls and young women.  These are the kind

11  of things that -- that parents fear.  And in the online

12  world today with their children, especially young

13  daughters, is that somebody will entice them and draw

14  them into something and before they know it, the trap is

15  sprung.  And that's -- that describes the activity that

16  you're facing.  The charges here today, it's not just

17  childish and immature, it's predatory conduct, I mean,

18  it's kind of every parent's fear.

19       And I'm not saying that defines you.  And I will

20  accept for purposes of this hearing that these are not

21  defining qualities in you.  I tell everybody that comes

22  in here that their life has value; you are worth

23  redeeming.  But not everybody is ready.  Some are, some

24  aren't.

25       The girls that you took advantage of, their lives

1 have value, too.  And in each of their cases you took

2 something from them of value.  Some more than others.

3 Some who were foolish enough to give you things you were

4 asking for but others, you know, when you engage in this

5 kind of conduct, at a minimum, you are stealing their

6 innocence.  You're drawing them into a world that they

7 don't -- that no one deserves to be drawn into.  The

8 world of exploitation and trafficking and pornography and

9 other illicit behavior.  An honorable man doesn't want to

10 draw anyone into those circumstances.

11      You know it's kind of like the old frog in the pot

12 story where, I'm sure you heard it, throw a frog in a pot

13 of boiling water and it will jump out but if you raise

14 the water a little at a time, it will stay until it

15 boils.  And the concept is if you get used to stuff, the

16 more you get used to stuff, you know, the less sensitized

17 you get and the way you can kind of be duped and drawn

18 off the right path.

19      And so even these girls who rebuffed your

20 solicitation requests, you know, just being exposed to

21 that, it's a little more used to it, maybe they're a

22 little wiser, but maybe there's also a little more

23 normal.

24      Bottom line is what I want you to get from this is

25 where I started.  If you're going to be a good person, an

1  honorable human being, you want to care about others,

2  protect others, particularly those who are weaker or more

3  vulnerable, or those over whom you have some authority or

4  power.  So if that's something that no one has ever told

5  you before, you won't be able to say that after today.

6        I'm going to take a few minutes and go look at

7  this and then I'll be back and give you my decision.

8        (Recess taken.)

9        THE COURT:  Court's required pursuant to Section

10  18-3553(a) to impose a sentence that is sufficient but

11  not greater than necessary to comply with the purposes of

12  sentencing identified in that statute.

13        In determining a particular sentence to be imposed

14  the Court has considered the United States Sentencing

15  Guidelines which promote uniformity in sentencing and

16  assists the Court in determining an appropriate sentence

17  by weighing the basic nature of the offense, as well as

18  aggravating and mitigating factors.

19        Court notes the parties have entered into a plea

20  agreement pursuant to a Rule 11(c)(1)(C) of the Federal

21  Rules of Criminal Procedure.  Court has considered the

22  plea agreement, statements of the parties, and the

23  Presentence Investigation Report.

24        After reviewing the presentence report the Court

25  finds that the sentencing guideline range is life, which

06/21/21      USA v. BALLEW      19-10076-01      43

1  is correctly calculated based on a Total Offense Level of

2  43 and a Criminal History Category of I.

3       This offense involves the defendant communicating

4  with minors via Facebook when he was operating the

5  Deandre Johnson account.  The defendant attempted to get

6  the minor females to produce and send explicit photos and

7  videos of themselves to him in exchange for money.  The

8  defendant also offered money to the minor females in

9  exchange for letting him take their virginity.  He

10 further threatened to expose further said explicit photos

11 if the minors did not send more photos and comply with

12 his demands.

13      His communication, including the visual

14 depictions, were sent via interstate commerce and was

15 transmitted using a facility of interstate commerce, that

16 being the Facebook Messaging service and the internet

17 itself.

18      Now when I look at the sentencing factors that I'm

19 supposed to consider under Title 18 United States Code,

20 Section 3553(a), the first is the nature and

21 circumstances of the offense, and the history and

22 characteristics of the defendant.

23      As I alluded to earlier, I think the nature and

24 circumstances of these offenses are different in several

25 ways from the typical possessing and trading child

1  pornography cases that I get in here.  In one sense, it's

2  less severe, I guess you'd say, less troubling, in the

3  sense that we only had two dozen images and three videos,

4  which is significantly less than is often the

5  circumstances in those cases.

6      On the other hand, this conduct in this case

7  involved direct communication between this defendant and

8  the minor victims.  He actually enticed them, in some

9  cases coercing them to give them these images, possibly

10 producing them but in any event, providing them to him.

11 These are all underage girls.

12      As I indicated earlier, you know, these are things

13 that -- that parents often fear.  They fear a lot of

14 things but they -- the person, the unscrupulous person

15 who is enticing and leading their daughters astray,

16 taking advantage of them sexually, you know, those are

17 serious matters and justice requires a serious

18 consequence.

19      But other ways that this is distinguished from

20 some of the circumstances that I more frequently see and

21 the range of circumstances that I think are contemplated

22 in the underlying statutes is this was all conducted

23 remotely.  There were no contact offenses, nor was there

24 indication of -- that I could see, from attempts to

25 actually engage in contact offenses or taking any sort of

1  actions to actually bear that out.

2        And as the defense pointed out, a number of these

3  defendants felt empowered to rebuff this defendant's

4  requests and advances and so you get the sense that the

5  power balance at play here is not as egregious as some of

6  the child pornography and child exploitation cases that I

7  see and that I think are contemplated by the statute, so

8  this presents a different sort of mix of factors, some

9  that I guess to use common terms would describe this,

10  some are more aggravating than the typical offenses that

11  I run into but some are less so, perhaps more mitigating,

12  if that's the right term; less serious.

13        I'm also supposed to contemplate the history and

14  characteristics of this defendant.  The presentence

15  report is replete with information that this defendant

16  struggles with a lot of mental health issues that have

17  plagued him for a significant part of his life, including

18  things that push him to suicide attempts and suicidal and

19  homicidal thoughts.  I mean, clearly he has some

20  significant mental health challenges.

21        He has diagnoses here for some sort of

22  intermittent explosive disorder that the PSR makes clear

23  that he is prone to; has anger problems and sometimes

24  struggles with explosive anger.  There is a lot going on

25  with this young man.  Not that this excuses the conduct

1   but it puts it in a certain amount of context.

2       I also look at his age at the time of the offense

3   being 20 years old.  Comparatively young for a lot of

4   offenders I find in here and with some of the older

5   victims the age difference was relatively small.  Doesn't

6   excuse the illegality of the conduct but, again, putting

7   the whole thing into context of what I am supposed to

8   evaluate here and considering the history and

9   characteristics of this defendant, and the nature and

10  circumstances of this -- these particular offenses, so

11  I'm trying to get the whole picture here.

12       And I think that becomes important in this case

13  when I go to the next factor to reflect the seriousness

14  of the offense, to promote respect for the law, and

15  provide just punishment for the offense.  Because this is

16  what invites me, I think, to look at the statutes as a

17  whole.

18       And I'll make this observation:  I think in cases

19  like this the sentencing guidelines aren't necessarily

20  all that helpful because I think the sentencing

21  guidelines take a somewhat narrower view of the range of

22  offenses that might satisfy the elements of these crimes

23  and they take the view of a -- some pretty harsh

24  circumstances, I think, considering the whole universe of

25  criminal conduct that these statutes cover, and that's

1  where the guidelines tend to end up.

2       So we -- we get these very high offense levels

3  that I think would be appropriate in some contexts for

4  these statutes.  For example, the 2251(a) offense -- turn

5  to it here -- contemplates a pretty broad range of

6  conduct which states, in relevant part, that among other

7  things, a person who entices or coerces a minor to engage

8  in sexually explicit conduct for the purpose of producing

9  any visual depiction of that conduct is going to be

10 punished, according to the statutory sentencing scheme

11 set forth in subparagraph (e) which is basically 15 to 30

12 years for a first offender.

13      That contemplates coercive conduct on minors that

14 may involve truly transporting them, in some cases in

15 interstate commerce, and producing a visual depiction of

16 sexually explicit conduct, in some cases even live

17 depictions.  So you can see that that could deal with

18 very minor children making full contact, you know,

19 intercourse and other penetrative sex act videos, which I

20 think would merit the sort of sentences that you're

21 seeing in the guidelines.

22      When I look at the statutes in those type of

23 situations I think it's more appropriate while I consider

24 the guideline range, to consider the spectrum of conduct

25 and offenders that the statute is intended to capture, to

1  try to figure out where this offense and this offender

2  lies on that spectrum.

3          So we have a sentencing range for first offenders

4  at 15 years all the way up to 30 years and you look at

5  some of the ways that you can get sort of the bottom end

6  of this sentencing range, I would note that this statute

7  would capture not only completed offenses but attempts.

8          It would capture a person who violates the statute

9  by mere use or persuasion of a minor, having a minor

10  assist in the production of a visual depiction, um,

11  things like that.  That captures sort of the entry level

12  conduct and that would expose someone to 15 years under

13  the statute.

14          The conduct in this case, I think, is higher than

15  that because here we don't have mere attempts, we have

16  inducement, enticement, and in some cases coercion used

17  on minor victims and we have actual videos or images that

18  get produced.  And I think the coercive aspect of the

19  conduct of some of these cases in particular moves it off

20  the bottom end of the sentencing spectrum.

21          But on the other hand, like I say, it doesn't

22  strike me as the sort of conduct that Congress was

23  contemplating at the top end of the spectrum.

24          I'll also note that this defendant has Criminal

25  History Category of I so, again, have to figure out where

1  not only the offense but the offender fits in the

2  sentencing ranges designated by Congress for violations

3  of this statute.

4      I think the victims -- excuse me, the defendant's

5  history and characteristics, including his criminal

6  history, is appropriate to help place him on that

7  spectrum.  This defendant has a Criminal History Category

8  of zero.  On the other hand, we have multiple offenses

9  and multiple victims so it's not just a single violation

10 of this statute, we actually have violations in Counts 1,

11 3, 8, 11, and 13 that apply to 18 U.S. Code, Section

12 2251(a).  So I think that's another thing that moves it

13 off the bottom end of that sentencing range designated by

14 Congress.

15      And just to be clear here, these counts will

16 affect minor victim one, two, five, six, and seven, so,

17 five separate victims were harmed as a result of this

18 defendant's conduct in violating 18 U.S. Code 2251(a) in

19 Counts 1, 3, 8, and 11, and 13.

20      Similarly, when I look at Counts 5, 7, and 15,

21 that's a violation of 18 U.S. Code 1591(a)(1).  And this

22 is an offense for which Congress has established a

23 sentencing range of ten years, all the way up to life.

24 So, once again, we have to look at, you know, in my

25 assessment of where on that spectrum does this offense

1   and this offender tend to fall.

2        If I kind of try to summarize this statute, it is

3   written in the -- in terms that necessarily make it easy

4   to add this in sort of on-the-fly here, but the statute

5   punishes conduct in and affecting interstate commerce

6   where someone uses force, threats of force, fraud, or

7   coercion or any combination of those things to cause

8   another person to engage in a commercial sex act or that

9   the person has not attained the age of 18 years and would

10  be caused to engage in a commercial sex act.

11       So just reading those descriptions of something,

12  that it covers a range of ten years to life, we've got

13  someone who's using force and talking about

14  what's -- what's the worst combination of facts here,

15  someone who is using force to compel someone to engage in

16  a commercial sex act, um, or -- just a moment.

17       So I guess as I read this, you can violate this by

18  using force, fraud, coercion, whatever, on someone who

19  has obtained the age of 18.  Or, alternatively, you can

20  violate it by enticing, recruiting, et cetera, someone

21  for a commercial sex act simply by virtue of the fact

22  that they have not obtained the age of 18 even without

23  force.

24       Is that -- I tell you when I start looking at this

25  it isn't the most easily written and interpreted language

1  on the fly here but is that --

2        MR. HART:  Your Honor, you're correct.  When it

3  involves those listed verbs of, I believe, patronize,

4  solicit, induces, entices, transports, harbors,

5  maintains, those can be done when a person is -- the

6  person that is made to engage or will be caused to engage

7  in a commercial sex act at a minor, that involves a

8  10-year mandatory minimum.

9        If force, fraud, or coercion is involved, whether

10 it's a minor or an adult, that then becomes a 15-year

11 mandatory minimum.  The upper end for both of those is

12 life.

13       But the way that adults are captured in that

14 statute is if there is force, fraud, or coercion

15 involved.

16       THE COURT:  Okay.  Good.  All right.

17       Getting back to the point that I was trying to

18 make is the upper end of all these are life.  So who is

19 contemplated there?  What sort of offenders and offenses?

20 And I think where you're seeing force or threats of force

21 compelling people to engage in commercial sex acts,

22 whether that's prostitution or production of sexually

23 explicit videos or other things like that, you know,

24 that's kind of the sort of offenses to me that end up at

25 the top end of the sentencing range.

06/21/21     USA v. BALLEW     19-10076-01     52

1          As Congress has laid it out here in Section 1591,

2    and then you start to looking, well, what sort of things,

3    and people bring you down to the lower end of the range,

4    and you can violate this act by simply recruiting or

5    enticing someone who is underage to engage in a

6    commercial sex act, and even -- even then when we look at

7    the ways that can be done you can have prostitution,

8    which is, you know, person on person actual contact, you

9    could have them forced to engage in sexually explicit

10   videos with other persons where they're -- there's actual

11   contact involved.

12         And in this particular offense you've basically

13   got the solicitation of nude selfies and videos from the

14   individuals involved from a person with a Criminal

15   History Category of I and zero criminal history points.

16         So when I sort of decide where this offense sits

17   on the spectrum of 18 U.S. Code 1591 with this offender,

18   it strikes me as being towards the lower end of that band

19   as well, and I think even that conceptually is reflected

20   in the presentence report in the grouping calculations,

21   although not perhaps as significant a disparity as I'm

22   describing to you here.

23         When I look at paragraph 106 on the multiple count

24   adjustments, even the sentencing guidelines recognize

25   that Counts 5, 7, and 15 have an adjusted offense level

1  of 34, whereas the other counts for sexual exploitation

2  earned 36 to 38 offense level, so I guess my point there

3  is simply that even the presentence report recognizes

4  that the conduct involved in Counts 5, 7, and 15,

5  qualitatively speaking, is somewhat less serious than the

6  activities that are being dealt with under the other

7  counts to which this defendant pled guilty.

8       So continuing where I'm going, reasoning under

9  3553(a)(2) on seriousness of the offense, promote respect

10 for the law, and provide just punishment for the offense,

11 kind of describe to you my thoughts on sentencing

12 guideline range versus the statutory sentencing ranges

13 but nevertheless, Mr. Ballew, you need to know, I mean,

14 these victims that you took advantage of, these are

15 still, under the law, children.  These people are

16 precious in the sight of their parents and their families

17 and they ought to be valued in the eyes of society and

18 every decent human being.

19      So what you did to them is serious.  You took

20 things from them, some innocence, some virtue, and in

21 some cases got images from them.  You did engage in

22 coercive blackmail and extortion type threats on a few of

23 them once you actually got some images out of them, so

24 while I've described my thoughts on where this sits on

25 the range of sentencing provided by statute for these two

1  offenses, do not take that as an indication that I don't

2  think this is serious business and it merits a serious

3  sentence.

4       Moving to the next factor, deterrence of criminal

5  conduct, I think both for deterrence of your future

6  misbehavior and other people who would engage in this

7  sort of conduct, for those who think this is less serious

8  because it is just something being carried out amongst

9  young people on Facebook or otherwise, they need to

10 understand it is serious.  These things hurt people and

11 they lead to other things that can hurt folks even worse

12 than that.

13      I think a sentence needs to be imposed that will

14 make sure that everyone knows that you engage in this

15 conduct, you're facing significant punishment.

16      The next factor is protecting the public from

17 further crimes of this defendant and, you know, that's a

18 hard one to evaluate.  I see this defendant's demeanor

19 here.  He appears to be remorseful.  And has hopes for

20 his future.

21      On the other hand, I understand from what I've

22 read in the presentence report, talking to people here,

23 the mental health issues that he suffers seem to create

24 in him a -- if he doesn't get those under control, a risk

25 of this or worse behavior in some cases.  If he has

1  homicidal thoughts and explosive anger issues, these are

2  significant concerns that if they play out in the future

3  or if they are used to justify this sort of behavior, if

4  you use those to justify this kind of misbehavior in his

5  own mind at the time, how is that going to work out in

6  the future?  And then what's it going to be like when

7  he's, you know, 40 years old preying on teenage girls

8  like this?

9       It's -- I want -- I want the best for you.  I

10 don't want you to be defined by this episode in your

11 life.  But, you know, the public looks to me to take this

12 into account and make sure that I protect them from

13 further misconduct by defendants that come before me,

14 so I think that overall this gives me some pause and it

15 makes me comfortable in imposing a sentence within the

16 range imposed by the parties because even the low end of

17 this is a significant sentence.

18      I think that this defendant has significant need

19 of substance abuse and mental health counseling and

20 training which won't be available to him while he's in

21 BOP facilities.  So this goes to the next sentencing

22 factor:  Providing the defendant with needed educational

23 or vocational training, or other treatment.

24      Significant mental health history here that

25 informs my sentencing decision in a number of ways,

1  including providing him with opportunities to access that

2  treatment while in custody and while on supervised

3  release, as I think that will be instrumental in helping

4  him successfully transition to civilian life once he

5  completes his custodial sentence.

6       When I take all these matters into account, all

7  the sentencing factors, the advisory sentencing

8  guidelines, nature and circumstances of the offense,

9  defendant's history and characteristics, and my

10 evaluation of statutory sentencing ranges and where this

11 defendant and this offense fits into those ranges, the

12 Court intends to accept the parties' plea agreement and

13 the Court intends to -- the Court intends to sentence the

14 defendant to 216 months' custody.

15       That's 18 years on Counts 1, 3, 8, 11, and 13,

16 those are the sexual exploitation of a child counts; and

17 15 years or 180 months on each of Counts 5, 7, and 15,

18 all those counts to run concurrently, for a controlling

19 sentence of 216 months' custody followed by eight years

20 of supervised release.

21       Court believes that that sentence is sufficient

22 but not greater than necessary to reflect the seriousness

23 of the offense , promote respect for the law, and provide

24 just punishment for this offense.

25       That it should afford adequate deterrence to

1  criminal conduct, and protect the public from further

2  crimes of this defendant.  I think that the supervised

3  release term, in addition to the imprisonment sentence

4  will allow the defendant the opportunity to receive

5  correctional treatment in an effective manner, assist

6  with community reintegration.

7       The Court intends to order a special assessment

8  totalling $800, that's $100 per count, to the Crime

9  Victims Fund.

10       The defendant is subject to the provisions of the

11  Justice for Victims of Trafficking Act of 2015.  In

12  addition the special assessment under 3013, the Court

13  shall assess an amount of $5,000 per count on any

14  non-indigent person.  The Court finds the defendant is

15  indigent and waives JVTA assessment.

16       Court does not intend to impose a fine due to

17  defendant's inability to pay.

18       There is no known restitution owed in this case.

19       Court intends to impose the mandatory and special

20  conditions of supervision set forth in Part D of the

21  presentence report along with standard conditions adopted

22  by this Court.

23       With the exception that the condition at paragraph

24  184 regarding substance abuse testing has been modified

25  since this report was issued.  We'll go with the new

1  language which limits the number of tests to no more than

2  eight per month.

3       This offense involves minor victims who the

4  defendant exploited and trafficked, therefore the special

5  conditions for no contact with any person under the age

6  of 18 unless in the presence of an adult who is aware of

7  the offense and who has been approved by the U.S.

8  Probation Office, and the Court's own commercial business

9  or other cases of unintentional and incidental contact is

10 appropriate.  This condition will provide adequate

11 deterrence to criminal conduct and protect the public

12 from further crimes of the defendant.

13      The defendant must not possess or have under his

14 control any images of pornography involving adults or

15 minors.  Defendant's history indicates he has a

16 propensity to possess child pornography as shown in the

17 instant offense.  This condition will provide a

18 deterrence to criminal conduct and protect the public

19 from further crimes of this defendant.

20      The condition requiring participation in any

21 recommended sex offender treatment program or mental

22 health treatment program is also appropriate given the

23 defendant's offense.  This treatment will help protect

24 the public from further crimes of the defendant, provide

25 needed correctional treatment.

1          The defendant's offense was entirely based on

2    internet and computer use.  He posted an online fake

3    profile and used the internet to exploit and receive

4    depictions of some of the minor victims.  Additionally he

5    used a cellular phone to contact the minor victims

6    through Facebook and store child pornography images.

7          Therefore, the condition of supervision requiring

8    the defendant to comply with U.S. Probation Office's

9    Computer and Internet Monitoring program is necessary to

10   insure adequate deterrence to criminal conduct and the

11   need for the sentence to protect the public from further

12   crimes of the defendant.

13         The defendant has a history of illegal drug and

14   alcohol use.  He was actively abusing marijuana at the

15   time of his arrest, along with sporadic drug and alcohol

16   abuse.  His participation in the substance abuse

17   treatment program with abstention from alcohol during the

18   term of supervision will assist the defendant in

19   refraining from the use of alcohol and illegal drugs

20   during his term of supervision and provide him with

21   needed medical care.

22         Defendant has a long history of mental health

23   conditions and a history of mental health treatment which

24   assisted him in managing these conditions.  The defendant

25   would benefit from mental health treatment to address his

1  mental health conditions.  His participation in a mental

2  health treatment program will assist him with

3  correctional treatment.

4       The search condition is appropriate in this case

5  given the nature of the offense, sexual exploitation of a

6  child, sexual trafficking of a minor.  Although the

7  defendant has no criminal convictions, his current

8  offense, includes several victims.  Further, the

9  defendant was arrested February 2018 and charged with

10 procuring obscene material but that arrest did not stop

11 his behavior.

12      He also has a history of substance abuse in

13 various forms with different sorts of drugs.  All these

14 make the search condition appropriate for deterrence of

15 criminal conduct and protecting the public from further

16 crimes of the defendant.

17      Voluntary surrender is not appropriate.  However,

18 the Court will make a recommendation for designation to

19 Seagoville at the defendant's request for programming

20 available at that facility.

21      Any objections?

22          MR. HART:  Not from the Government, Your Honor.

23          MS. AMYX:  No, Your Honor, thank you.

24          PROBATION OFFICER FARIAS:  Your Honor, if I may.

25 I may have misheard.

1          Did you say there is a statutory requirement that

2   the defendant register as a sex offender?  I just wanted

3   to point that out for clarification.

4          It is in the PSR, but...

5          THE COURT:  Okay.  One of the mandatory

6   conditions of supervision described in paragraph 186 of

7   the presentence report is that you comply with the

8   requirements for the Sex Offender Registration and

9   Notification Act as directed by the probation officer and

10  the Bureau of Prisons, or any state sex offender

11  registration agency at a location where you reside, work,

12  or are a student, or were convicted of a qualifying

13  offense, which is in this district.

14         Does that cover it?

15         PROBATION OFFICER FARIAS:  Yes, Your Honor,

16  thank you.

17         THE COURT:  Defendant will rise for imposition

18  of sentence.

19         Court accept the parties' plea agreement.

20         In accordance with Federal Rule of Criminal

21  Procedure 11(c)(1)(C), the Court determines the

22  Presentence Investigation Report and previously stated

23  findings are accurate and orders those findings

24  incorporated in the following sentence:

25         Pursuant to the Sentencing Reform Act of 1984 it

1  is the judgment of the Court that the defendant, Austin

2  Ballew, also known as Austin Lee Ballew, is hereby

3  sentenced to the custody of the Bureau of Prisons for a

4  term of 216 months on Counts 1, 3, 8, 11, and 13, all

5  those counts to run concurrently; and 180 months on

6  Counts 5, 7, and 15, those counts to run concurrently

7  with each other, and with the custodial sentence imposed

8  in Counts 1, 3, 8, 11, and 13 for a total controlling

9  term of 216 months' imprisonment.

10       This term of imprisonment shall be followed by

11  eight years of supervised release on each of Counts 1, 3,

12  5, 7, 8, 11, 13, and 15.  All counts to run concurrently

13  for a total of eight years of supervised release.

14       Within 72 hours of release from the custody of the

15  Bureau of Prisons the defendant shall report to the U.S.

16  Probation Office in the district in which he's released.

17  While on supervised release the defendant shall comply

18  with the mandatory and standard conditions adopted by

19  this Court, and the special conditions of supervision set

20  forth in Part D of the presentence report.

21       As ordered, the defendant shall pay the United

22  States a special assessment of $800, which is $100 per

23  count, to the Crime Victims Fund.

24       Payment of the assessment is due immediately and

25  may be satisfied while in Bureau of Prisons' custody.

1          Court waives the JVTA Assessment.

2          Imposition of a fine is also waived.

3          Both the Government and defendant are advised as

4    to their respective rights to appeal this sentence and

5    conviction.  An appeal taken from this sentence is

6    subject to 18 U.S. Code, Section 3742 and is subject to

7    any waiver in the plea agreement.

8          The defendant is advised it is your right to

9    appeal the conviction and sentence, but only to the

10   extent you have not waived that right in the plea

11   agreement.

12         You also can lose your right to appeal if you do

13   not timely file a notice of appeal in the District Court.

14         Rule 4(b) of the Federal Rules of Appellate

15   Procedure gives you 14 days after entry of judgment to

16   file a notice of appeal.  If you so request, the Clerk of

17   the Court shall immediately prepare and file a notice of

18   appeal on your behalf.  If you are unable to pay the

19   costs of an appeal, you have the right to apply for leave

20   to appeal in forma pauperis.

21         Defendant's remanded to the custody of the United

22   States Marshal Service pending designation by the Federal

23   Bureau of Prisons.

24         Court recommends designation to the federal

25   facility of Seagoville for reasons previously stated.

1          Does the Government have a motion on remaining

2   counts?

3          MR. HART:  Yes, Your Honor.  The Government

4   would move to dismiss Counts 2, 4, 6, 9, 10, 12, and 14

5   of the indictment.

6          THE COURT:  Motion is granted.

7       Anything else?

8          MR. HART:  No, Your Honor, thank you.

9          MS. AMYX:  No, Your Honor, thank you.

10         THE COURT:  Very well.

11      Court's in recess.

12         (Proceedings conclude at 11:15 a.m.)

13      ********************************************

14               C E R T I F I C A T E

15      I, Jana L. McKinney, United States Court

16  Reporter in and for the District of Kansas, do hereby

17  certify:

18         That the above and foregoing proceedings were

19  taken by me at said time and place in stenotype;

20         That thereafter said proceedings were

21  transcribed under my discretion and supervision by means

22  of transcription, and that the above and foregoing

23  constitutes a full, true and correct transcript of

24  requested proceedings;

25         That I am a disinterested person to the said

action.

IN WITNESS WHEREOF, I hereto set my hand on this, the 6th day of July, 2021.

s/ Jana L. McKinney
Jana L. McKinney, RPR, CRR, RMR
United States Court Reporter

I N D E X

                                                    PAGE


Government Recommendations                            5
Defense Recommendations                              7
Allocution                                           39
Reporter's Certificate                               65